Case 15-5384, Anthony Hines v. Tony Mays. Argument not to exceed 30 minutes per side. Mr. Bote, you may proceed for the appellant. Good afternoon. Good afternoon. Chief Judge Cole, I'd like to reserve five minutes for rebuttal. That's fine, and you may proceed. This afternoon I'd like to focus on two issues in particular. The first is the DNA exclusion evidence, which entitles Anthony Hines to a hearing under Martinez. And then also counsel's ineffective assistance for failure to make an objection to the fair cross-section violation. You can either pull the mic up to you or speak louder. There's a button. You can raise the whole thing if you want. The entire podium. Is that a little better? Keep your voice up. Okay, absolutely. I'm sorry. I'm trying to speak right into it. Okay, so as I was saying, I'd like to focus on the DNA exclusion evidence and the entitlement to a Martinez hearing. And then also counsel's failure to make an objection to the fair cross-section violation under Duren and how that entitles Mr. Hines to relief as well. I'd like to start with the Duren claim in particular because the Duren claim, there's really no question that there was a Duren violation here. And we get to that pretty quickly because even in the state courts, the state conceded that women were a distinctive group and that they were significantly underrepresented for 10 years, 11 years actually. Whereas they constituted over 50 percent of the population in Cheatham County, Tennessee, they only constituted 10 to 22 percent of the veneers in Cheatham County as well. So the only real question in the state court as it was raised was whether there was a systematic exclusion of women under the circumstances. Now, the state court found that there was no systematic exclusion. And as we have argued in our brief, that finding is both contrary to Duren and also unreasonable under 2254D. What was the evidence relied upon in Duren to find systematic exclusion again? The systematic exclusion there, first of all, there was a statistical showing that indicated that women were over 50 percent. That's a different prong than systematic exclusion, correct? Yes. What evidence was, I just don't remember. There was an exemption that was allowed for women in Missouri. So it was an objective, it was a statutory criterion. That's correct. That's correct, Judge. And so I guess, you know, just to tell you up front, my question here is on habeas. What Supreme Court case clearly establishes that this more ad hoc exclusion evidence, e.g., too many women, too many women, that that establishes systematic exclusion so that no reasonable state juror should think otherwise? Well, I think there are two approaches to that, Judge. You're looking at it, I think, from a 2254D1 perspective. Right. You also look at it from a 2254D2 perspective. And you really – I mean, if you're talking contrary to, you have to, I mean, map on very, very closely on the facts, which given that you had a statutory criterion there and you don't at all here, that would seem to be an uproad. We don't have the statutory criteria here. But what we have is the essential – the same conclusion based upon what happened in practice. So even though women were excluded as a statutory matter in Durham, what was happening here was the exact same thing. And I think – so to the extent that you have a slight factual difference, I don't think that that means that we still haven't proven our case. Well, it's not really slight to have an actual statutory criterion you can point to on the one hand and on the other hand have this sort of more anecdotal evidence. Well, on some level, Judge, I would argue actually when you have somebody saying we're excluding women based upon the fact that they're women and we're using stereotypes. Who said that? Well, you had Dolores Moulton who talked about that. She was one of the clerks who explained that she specifically excluded women because they had children and needed to stay at home. She also testified that women were schoolteachers and they were excluded for that reason. And so as a result of that, I mean, I don't see any real ultimate difference in the fact that you have a complete exclusion under the statute, whereas under these circumstances, essentially, you had somebody saying we're excluding women because they're women. I think that's really the point of Durham. I thought like, for example, schoolteachers, that was gender neutral. It was just schoolteachers. Well, and that's not what Dolores Moulton said. She said she was excluding women because they were schoolteachers. I thought there was testimony that was to the contrary of this sort of, I don't want to say extreme, this view that Moulton had. My recollection was there was a woman clerk maybe – I'm sorry, I don't have it at my fingertips – who had a more benign view of this whole thing. Am I mistaken? Well, to be clear, Moulton was the clerk. Adkinson, Ms. Adkinson, Martha Adkinson was one of the jury commissioners. And, I mean, Adkinson did not testify because she was in a nursing home. Moulton testified as to how the process worked. But sometimes they excluded men because they were tobacco farmers. I understand that. But I think the fundamental problem is that under the circumstances here, whether they were excluding certain people for particular reasons, they were excluding women in a systematic way that underrepresented them in a way that didn't provide for a cross-section of the community. And this is an ineffective assistance claim, right? That's correct, Judge White. But wasn't there some indication that counsel thought that this would consume too much of their resources and that they had a better chance of success putting the resources elsewhere? That's what they said in terms of the 1989 retrial, the resentencing proceeding. In terms of the 1986 trial, the objection was never made in as steep – But what does it matter if he was retried? What I'm saying is just to set forth what exactly happened. In 1989, Mr. Stack understood what the law was. He understood he could make a challenge at that point. In 1986, he didn't understand what the law was. And that's what his testimony was. He said that, quote, I know at the first trial it was never even thought of. He wasn't aware of the claim in 1986. I know, but what's the consequences of that? Where's the prejudice? Well, the prejudice is, one, Mr. Hines was tried before a jury that did not represent a fair cross-section of the community. But wasn't that vacated? No, not his conviction. His 1986 conviction wasn't vacated. Okay, it's just the – okay. Right, so you're focusing on 1989. So the 1989 is separate from 1986. So his 1986 conviction remained intact based upon the violation of the fair cross-section. Same thing with 1989. I'm focusing on the 1986. Is that clear? Because the point really was in 1986 that Steve Stack did not know what the law was. And that's what he testified. We never looked at that as an issue. He testified to that. We have that in our brief. So he was just ignorant of what the law was. By the time 1989 rolled around, he understood what the law was. And he could have challenged that as to the resentencing. But you're complaining about the 1986 conviction, not the sentencing. We're complaining as to both. But Mr. Hines clearly has a weaker claim as to the fair cross-section claim as to 1989. Because that was strategy? The state court held it to be strategic under the circumstances. But for 1986, you're complaining about the conviction, not the sentencing, right? Yes, that's correct. Okay. Yes. Just to make that clear. Can you remind me, what did the state – or the state court wouldn't have said anything in 1986 on this point? About whether there was systematic exclusion. That's correct. The only ruling on the issue was the Court of Criminal Appeals and the post-conviction proceeding. So, I mean, I guess this gets complicated because you have a – you know, frequently the case with Strickland claims you have a substantive issue buried in a Strickland claim. But we had the state court in 1989 saying that there was not systematic exclusion. I mean, presumably that they would have said the same thing in 1986, right? The Court of Criminal Appeals ruled on it in 2004 in the context of an ineffective assistance of counsel claim. Keep your – the end of your sentence. I'm sorry. The Court of Criminal Appeals did not rule on the claim in 1989. The Court of Criminal Appeals ruled on the claim as an ineffective assistance of counsel claim in 2004. Okay. Saying there was no systematic exclusion. And it's our position that – Which would mean that the failure to make the argument – unless something had changed, the failure to make the argument in 1986 was not prejudicial if you accept their finding because it would have been a meritless argument because there was no systematic exclusion. If the state court were correct on the merits of the Duren claim, that's correct. So you need to show that the state court, you know, even in the context of the deference we owe them here, that the state court blew that call. When they said that there was no systematic exclusion, that was incorrect, exactly. And that's what we've argued in our brief because, as we've said, not only did Dolores Moulton testify that women were being excluded in a systematic way because of the fact that they were women, but we also see that from Dr. O'Reilly's affidavit, which was Exhibit 43 in the post-conviction proceedings, in which he was showing that you had women underrepresented by seven to eight standard deviations all the time, you know, throughout an 11-year period. So you can look at the mere fact that for 11 years women are being underrepresented by their 10 to 22 percent of the veneers when they should be over 50 percent. And then when it goes on for 11 years, that in and of itself demonstrates that there's a systematic exclusion, that it's not something random, and that's what Dr. O'Reilly essentially testified to. And your claim is that counsel was ineffective for not bringing it, but is that... The remedy for that is, if counsel had raised it, right, he could have been re-indicted, right? I mean, it's the kind of claim that can be waived in the sense that your remedy is to be re-indicted, it's not... The remedy, if I may judge, the remedy would be to be tried by a veneer that is fairly representative of the community. Wait, this was the petitior veneer? Yes. I'm sorry, I thought you were talking about the grand jury. Yes, so the remedy would have been he would have been able to be tried in front of a jury veneer that actually represented a fair cross-section of the community had the objection been made. That's really the point. But if it's made timely, the remedy is to get a proper jury. That's correct. Right? Yes. Or at least the court has a chance to get a proper jury. That's right. And you ended up with a jury of three women? That's correct. And the argument that the warden posits is that's a fair representation of the community? Right. But even if you just go by the sheer numbers, as we also demonstrated in our brief, Chief Judge Cole, the state court cited State v. Stroud for that proposition, but as we've shown, Holland v. Illinois and United States Supreme Court case law makes it pretty clear that the fair cross-section requirement applies to the veneers, not to the petty juries. So the fact that there were three women on the petty jury doesn't make a difference. And even then, that actually proves our point. If you're trying to say it was representative, well, there should have been six women or maybe seven women on the petty jury. But as I said, legally, that doesn't make a difference, which is why the state court's ruling citing Stroud saying, hey, no harm, no foul. There were three women on the jury. It's contrary to an unreasonable application of Supreme Court precedent under the circumstances. And I would also just like to mention, Judge White, when you look at cases like Taylor v. Louisiana or J.E.B., which dealt with the striking of women from petty juries using peremptory strikes, the Supreme Court has been pretty clear that once you strike a particular group from the jury pools, you've lost something very serious in terms of – and something fundamental in terms of what the Constitution requires and what our criminal justice system requires, which is why in Taylor, for instance, the Supreme Court talks about the fair cross-section being fundamental to our criminal justice system, which is why then later on a case not specifically talking about the fair cross-section requirement, but Bank of Nova Scotia v. United States, which was 487 U.S. 250 in 1988, where the Supreme Court talks about the exclusion of women or people of particular race renders the proceedings fundamentally unfair. So the harm is not simply that the individual, Mr. Hines, didn't get a trial before a veneer that represented a fair cross-section of the community. It's also clear that the Supreme Court has said under these particular circumstances, when you don't have the fair cross-section of the community, the entire community is harmed. The criminal justice system is harmed, which is why there has to be a remedy for that under the circumstances. Is this a factual finding, the systematic exclusion? I think it's probably a little bit of both. But I think we have argued that it is a factual finding under 2254 D.2. We've also argued that under 2254 D.1, that a finding of systematic exclusion can be a legal question as well. But I think more fundamentally, it's probably a factual question. But our point as to 2254 D.2, looking at it as a factual matter, is that you can't say, as the state court did, that there's not a systematic exclusion of women. But based on the testimony of Dolores Moulton and Lloyd Harris as well, and based upon the length of time that this went on for 11 years, there's no other explanation, as Dr. O'Reilly explains, other than a systematic exclusion. It's not by chance. You don't think a rational jurist could take any other view of the evidence, the record in this case, than that? Under these circumstances, no. I really don't, Judge. And the reason why I said it is because you've got 11 years. Is there any case that would make clear to the state court that a certain length of time creates an almost irrebuttable presumption of systematic exclusion? I don't know that there would be a case there. A United States Supreme Court case would say that. I mean, I know, again, this is embedded in a Strickland claim, but typically you need Supreme Court precedent that would make clear to the state court that it has to rule a certain way. Right. But it doesn't have to be on all fours. Right. No, it doesn't. But the farther away it is, the more latitude the court has. Right. I mean, the only case that you seem to have for systematic exclusion involved a statutory criterion, not any of the things we're talking about. Not conflicting testimony. I think this testimony could be read a couple different ways. Moulton wasn't the only person who testified. We don't have a case involving this sort of longstanding thing and what we ought to infer. I mean, must we infer systematic exclusion because of that? Well, I think when you talk about that it's of a longstanding nature, I think – I don't know that you specifically have to infer it, but that's just the reality of it. How can something go on veneer after veneer, year after year? For 11 years, women are – they're one out of ten people in the veneers when they should be constituting five or six out of every ten people in the veneers. How can you explain it other than a systematic exclusion? It's not – it's – when you talk about systematic exclusion, I think we also have to be careful not to read the word systematic too narrowly. That systematic has to be some sort of a statutory exemption or something like that. It's is there a method or means that is being used that is creating underrepresentation? It could be any type of system. It could be – Is there a case that says – that defines systematic the way you just have? I don't – It would be one thing if we were here on direct review and we could kind of free wheel a lot of this stuff. But we can't sort of introduce new principles and new ideas at this stage. I mean I agree with that, but systematic means systematic. It's part of the system. I mean the ultimate response to that is, well, if you can come up with a creative way to exclude people from the jury, which is like Amadeo versus Zant, for instance, you deliberately exclude people from the jury. So if you can come up with a creative way to do that that nobody's ever done before, well, then you get away with it. I mean – so I guess our position ultimately is you have to look at what – is there a system, number one. Is it excluding people? And when you have people saying we are excluding people because they are women based on stereotypes of women, and when the ultimate result of that is that women are being underrepresented, it seems to me that it's pretty clear that that is a system that is depriving women of the right to serve on the juries. That being said, I only have a few minutes left here, and I just wanted to – Well, introduce what you wanted to turn to next, but there's another issue that I'd like to hear about. But I would like to hear your first statement at least about the DNA. I merely wanted to say that I wanted to make a couple of remarks about Mr. Hines' entitlement to a Martinez hearing on the DNA evidence. That was what I wanted to speak about, but I'd be happy to answer your questions too, Your Honor. Well, I would like to hear about the ineffective assistance with respect to the witness, Jones. Is there anything you want to say about that? Well, I think what's important about Ken Jones is that we know that he lied to the jury. Here's somebody who was at the motel at the time of the offense, and generally the offense seems to have occurred probably around 11 o'clock, 12 o'clock. He claims he only got to the hotel afterwards, that he was looking for a key. He went across the street. He then came back to the motel to use the restroom in room 21, and lo and behold, he encounters the victim there. It's pretty clear that that's false. He is an individual who every Sunday would go there for a tryst with his paramour, and he was there earlier in the day. So he lied about the fact that he wasn't there at the time that the offense occurred. And what I think is most important about Jones in that issue is that when he goes across the street to report that somebody has been injured, he explains that the woman has been stabbed. And the fundamental problem with that is that the body was wrapped in a bedspread in room 21. So why is it, are you just thinking that your brief is adequate and doesn't need explanation? Well, I guess the point is simply that if you have somebody who is at the crime scene who has the opportunity to commit an offense, who lies about his whereabouts during the time that the offense was committed, and as we've also noted in our brief, he knew the victim as well. So there's some potential for motive there as well. What exactly is that potential? I mean, I'll be candid with you. That's where this claim just totally craters with me is this guy was not even an inculpatory witness, as I understand it. He wasn't fingering your client as the killer. So I guess the idea is that he would be the real killer? Well, there's certainly some evidence that he could have been. We know that he was there in the room with the victim before the victim was found. We know that he lied about it. Can you match that up against the inculpatory witness against your client? I mean, it is just not remotely as strong. Your client had dried blood on his shirt, according to one witness. He always carried this hunting knife, according to another witness. He had the victim's wallet. He had, by one account, $3,500 or $35,000, which is probably the money in the bloody bank bag. He told the arrest—he volunteered to the arresting officer that he stole the woman's car but didn't kill her before the officer said anything. And, I mean, the idea that this guy who's going there to have an affair is somehow the killer despite all that, I'm just being candid with you. It's very hard for me to see the prejudice in this Strickland claim. Well, I think the point really about that is that under Tennessee law, the requirement is that, and as the jury was instructed, the prosecution had to exclude all reasonable hypotheses except the guilt of the accused. And so to the extent that there is a reasonable hypothesis that is out there, and a reasonable hypothesis is exactly as Mr. Hines said, that he did in fact steal the woman's car, but he didn't kill her. When you also have Ken Jones who is at the hotel and lying about what he's doing and he has information about how the victim supposedly was killed, I mean, there's no doubt that there is conflicting evidence and there is evidence that can be considered inculpatory to Mr. Hines. There's no question about that. But the question ultimately in terms of the reasonable doubt here is, is there a reasonable hypothesis other than Mr. Hines' guilt? And when you add Mr. Jones in, and Mr. Jones is saying things that, one, we know aren't true about his whereabouts. Sure. They probably knew it wasn't true, honestly. The first time I read that about grabbing this key randomly to go to the bathroom, and before I knew anything else about Jones, I was like, that's baloney. And I bet the jury had, I bet there was some impeachment sort of baked in. I mean, I doubt they. Obviously, that's hard to say from a cold point of view whether that's true or not. I know. Yeah. And then do you want to adjust the DNA? Well, I don't have a whole lot of time left, but just simply when you talk about the DNA, the DNA establishes precisely what DNA does establish. We have a contact between somebody other than Daryl Hines and the victim. We have intimate contact. There's no question about that. And the fundamental problem that we have with the district court opinion is that the district court says that that's irrelevant because the district court believed that there was no sort of sexual contact that occurred. Well, the fundamental problem with the district court's opinion is that the DNA proves that the premise of the district court's opinion that there was no sexual contact is completely false. And that's the same sort of problem. I don't know when that came from. Also, I think it just says body fluid, right? What do you mean by? The DNA. Does it say that it's semen or does it say that it's someone else's DNA? It says that it's someone else's DNA. But we don't know what it was. And that's correct. And the reason for that is that whether there was semen or not, you can only detect semen for a particular period of time. And what happened here, as we've argued in these other claims, is that there was semen evidence that could have been tested that Dr. Harlan identified as wanting to test for semen, and that got destroyed. But we also don't know how long the source of that DNA had been there, right? It's in her underwear, right? That's correct, yes. We don't know how long she was wearing it. We don't know. We know nothing about it. And it just shows that at some point, there was another source. It doesn't tell us anything, right? I disagree with you on that. It says that not only that there's one other source, that there are two other sources. And I think what's important to recognize as well, Judge White, is that this is essentially how DNA exonerations work. In-house, we had evidence on the victim's clothing. And when you have evidence on the victim's clothing, you're right. We don't necessarily know when that happened or whatnot, but it gives you the identity of the person that was intimate with the person's clothing. And we've also cited this case Mills v. Bernard from the Sixth Circuit here. Again, you test the clothing, the underwear of the victim, and what you see is that it wasn't Mr. Mills' DNA. And so, just as a practical matter, I think what we see is that what jurors would understand. But what's the standard? The standard for? With the DNA. What does the defendant have to show? Well, we're arguing that we're entitled to a Martinez hearing based upon the new DNA evidence. And so what we have to establish is that, as to our ineffective assistance of counsel claim, that counsel was ineffective for having failed to investigate the physical evidence. We have to show that the claim is substantial in light of the DNA evidence. And we have to make a prima facie showing that post-conviction counsel was ineffective for not having raised the claim. That's the standard. Your initial time has expired. Thank you. You'll have your full rebuttal. Okay. Thank you, Judge McCall. Ms. Bowen? No. It's okay. May it please the Court. Meredith Bowen on behalf of the respondent. I'd like to go in reverse order to attempt to clarify. It's not going to work. I'm so sorry. You want to raise it some? You can raise it a little bit. I know it's a big room, so you have to use your trial voice. Okay. I know you want to go in reverse. Is that better? Maybe raise it a little bit more. As long as I can hear you, I don't care. Just speak up, if you would. So I know you like to go in reverse order, but I wonder if I could get you to start in with the Ken Jones matter. Absolutely. The issue there seems to be there's an argument that Hines Counsel were ineffective for failing to both investigate and effectively cross-examine Mr. Jones. Yes. And given the record that he, Mr. Jones, found the body, I don't know how you ever want to factor in this $20 bill being placed in the victim's wristband. But the record seems to indicate that the counsel did not investigate in part, or maybe in full, because there was this concern about embarrassing Mr. Jones, given the circumstances that took him to the motel. Yes, Your Honor. So it does seem to be, at least a good argument can be made that that's deficient performance. I think that you would at least investigate the person who found the body and was there for whatever reason. I'm struggling with the prejudice prong of that, and I guess I'd like to hear your thoughts on that. The warden argues that to raise this issue was somehow, the defense would undermine its credibility. Absolutely. So I guess I'd like to hear that because I have somewhat similar reaction to Judge Kethledge on the prejudice prong, but I'm also concerned about it. This is the one person who, you know, who knows what, I'm not exactly sure what theory would have been presented, but he could somehow be inculpated, arguably. Yes, Your Honor. Long question, a little bit of commentary. Respondent is certainly not going to argue with you about deficiency. Deficiency was found by the state court, and respondent's position is that the state court's determination that prejudice wasn't established is completely reasonable. Judge Kethledge has it completely correct, which is although, and it wasn't necessarily a failure to investigate as much as defense counsel knew exactly why he was truly there that morning, and simply didn't elicit that testimony in the course of the trial. Had he elicited that testimony, we then have the PC hearing at which he testified, his girlfriend testified, his wife testified, and we have before us a record of all that a jury would have heard in terms of why he was really there that day, the history as to the fact that he had been there over 100 times, known to the manager and owner, known to the victim herself, that this was their routine. And that then to take those facts and that testimony to then present a theory in which he was the murderer or in some way because of the way there is this allegation, even though he testified he wasn't sure or couldn't remember whether he said it was a woman lying in the bed, that suddenly we have reasonable doubt is completely far-fetched. But he also said she was stabbed when there's no way he could have known that. His testimony at the PC hearing was that he didn't remember saying those things. The PC... When his testimony was presented in the post-conviction. The post-conviction. Sorry. Yes, Your Honor. In my mind, PC is probable cause. I was a trial judge. He doesn't remember saying that to the 911 operator. He certainly didn't deny it. He just doesn't remember. Even if you were to take those facts and consider them to be true, what then defense counsel would have been saying if he had furthered, even in light of the evidence that I was there to meet my girlfriend for the hundredth time. Oh no, you're the murderer. In terms of his credibility before the jury, he would have completely risked his then soon-to-be mitigation, sentencing, etc. to say this 51-year-old man, this Sunday morning, on the hundredth time, brought his girlfriend to the motel to murder the maid, have his girlfriend drive back... You run it differently. It's that he's hiding something. He obviously interacted with her already because somehow he got the key and she had a $20 bill. And maybe she's blackmailing him because she's the one who knows all about it. And somehow or other, he knew it was a woman and he knew she was stabbed. And the first thing the defendant said, yeah, he's not Mr. Innocent, but he says, I have the car, but I didn't kill her. Absolutely. And what Respondent's position would be that even if you were to have furthered a theory that there was some sort of blackmail and there was motive, which certainly wasn't presented in either the post-conviction or during the original trial, you still have to overcome the overwhelming amount of evidence that Petitioner is the murderer. And that was the prejudice analysis done. And where does that come from? There's no DNA. In fact, if they had some of the DNA, they could do even more with it. It's basically that he carries a knife, but it wasn't that knife, right? And he was telling cockamamie stories, which, I mean, he's got this stolen car and, you know, there's obviously something behind it. So I don't know that it's so impossible. Respondent's position that is in support of the state court's determination that any furtherance of a theory that Ken Jones was the real murderer and that that theory would have overcome the evidence that Petitioner was in fact the killer is incredibly far-fetched. In addition to all that you've discussed. I want to make sure I understand. The evidence was these stories that he was telling people, right? I disagree, Your Honor. What is it? That's what I want to know. The evidence is that Petitioner checked into the Saban Motel that morning. Sorry, that what? He checked in? He checked in the early morning hours. That he was then seen by the manager and asked if he was ready to check out, and he said, no, not yet. The manager left. He left the maid in charge. The Petitioner was obsessed with knives. Although he wasn't found with the murder weapon, he was found with other knives on his person at the time. When shown pictures of his motel room with stabs into the wall and questioned as to what the markings were, he said, those are knife marks. Not only did he steal her car and drive away with it with blood on his shirt. He was then picked up, driven to his sister's in Bowling Green by these young people, told these cockamamie stories, absolutely, and still had her key on him. They found her wallet and then unprovoked, volunteered when the police come to arrest him, I stole her car, I didn't kill him. Only moments later to say, if you could promise me the death penalty, I will tell you all about her murder. The evidence in this case was overwhelming. The DNA in no way supports Petitioner's contention that there is actual innocence, that there's anything that exonerates him. There is no way that a jury, in light of all of this, that they would have overcome these facts with a theory that Ken Jones, on the hundredth morning, suddenly was being potentially blackmailed by the maid. It's far-fetched. The state court said it would have ruined defense counsel's credibility. It would have taken the jury from something that was far-fetched speculation into a realm of fantasy. Prejudice cannot be established. What about in the penalty phase? What about the residual doubt phase? The argument on behalf of a respondent would be the same. I'm sorry, what? The argument on behalf of a respondent would be the same, that in light of the overwhelming, aggravating circumstances, that in terms of residual doubt at sentencing, that it wouldn't have made any difference. Was the residual doubt a penalty phase thing or a guilt phase? It was a sentencing. Okay. Yes. If I can, and certainly if the court has a preference, clarify both the DNA and then the jury veneer issue, I can quickly go through the DNA and the request for an evidentiary hearing. I think the bottom line is the district court granted after the state court denied both the DNA testing and the fingerprint testing with no exonerating results. What would Petitioner have presented at a hearing other than these reports? His own expert says no sperm. DNA could have, as you said, Your Honor, come from anywhere. Saliva, earwax. She was married. She lived with her husband. Yes, but there were two other people, right? She had sons. We're talking about underwear that had been slashed and thrown across a motel room onto the floor and then in 1986 collected for the sake of trial. We don't know where the DNA came from. DNA is not sperm. DNA in no way exonerates Petitioner. And in terms of this claim that he was denied an evidentiary hearing, the standard is good cause and Petitioner cannot establish good cause that he was entitled to an evidentiary hearing. The district court granted the request for this evidence to be tested, to be discovered, and even based on their own experts' reports, the district court would then have to have, based on the entirety of the evidence, all of that presented at the jury trial, with the new, contemplated whether or not this would have changed the outcome, whether or not actual innocence can be established, and the district court properly found that it could not and denied the hearing. And that decision was not an abuse of discretion. It should be affirmed. I will now move on to the question of the jury. I'd like to take a step back and clarify that this claim has three distinct parts. Three distinct parts. The first is an allegation that trial counsel was ineffective for failing to raise the discrimination of women for the 1986 trial jury. The second claim relates to the 1989 sentencing, and then the third portion of the claim, which was not discussed by Petitioner, initially pertains to the foreperson. The allegation of discrimination is for the foreperson. Petitioner completely seems to dismiss Strouth and move on and say that a Tennessee court case that says that three women on a jury, which is what he had, is proper prosecution, and therefore, regardless of whether trial counsel said at the post-conviction hearing that he didn't think of the claim, there was no basis for a claim because there was a Tennessee court case at the time that said that's a fair cross-section. You're not guaranteed a 50-50 split. Yes, but aren't there cases that say we look at the veneer, we do not look at the actual jury? I'm not familiar with a case that would, based on looking at the veneer and not at the jury, overrule the fact that then in your jury you have three women, which is a fair cross-section. Okay, so what case are you relying on? Strouth. Strouth? Struth? Struth. Am I mispronouncing it? Is that a recent one? It was a 1981 case. No, it would have been the case at the time. Supreme Court of Tennessee? But this was a federal constitutional claim. It would have been, right? It was, and they dismiss this claim by saying that it's overruled in some way by Holland, which, as I set forth in Respondent's Brief, misconstrues the difference between in Holland there was an underlying Batson claim. That's in no way relevant to the claim before the court here. Not only did he have no reason, trial counsel, to think that there was some sort of discrimination, but with the three women on the jury, had he raised it based on, although it's a federal claim, this Supreme Court of Tennessee claim at the time, it most likely, Respondent would argue, would have been overruled. So you're saying it's not deficient performance in the 1986 matter? Correct. Moreover, you can't establish prejudice because the three prongs of Duren can't be established. And so as to the 1989 and the three prongs of Duren and the third prong of systematic exclusion, you asked, what's the Supreme Court case to back up your position? And the answer is, there is not one. At the time, in 1989, there would have been two Supreme Court cases, Taylor v. Louisiana in 1975 and Duren, which was 1979, which would have led the court, based on these facts, whether you're looking at the 1986 jury or the 1989 resentencing, to find that there is no basis for a factual determination that there was systematic exclusion. I feel that Petitioner has misconstrued the testimony from those at the post-conviction hearing who testified regarding the selection. There were statements, as you mentioned, about farmers. All of the statements she made in her testimony regarding school teachers was gender neutral. Respondent isn't going to opine that there were equally men and women as school teachers in the 1980s, but the statements about the exclusion of the school teachers was gender neutral. She even went so far as to say that, in terms of the woman who didn't testify, that she would often complain at times that she believed that women had to be removed because there were too many women in the box. I guess when one reads that, I guess you can read it two different ways, and maybe I don't have enough of a perspective on this record to know which way. You could read it to mean there's just a surfeit of women on these juries, ten women or something, and we need to make sure we have adequate representation of males. It's kind of hard to believe that would be it, based on some of the statistical evidence. Or you could read it to mean that, even with relatively modest numbers of women, she wanted that number to be even lower. So, I mean, you're suggesting that it's a more benign explanation, that there were plenty of women on the veneer, and she's saying we need to reduce them. How do you read it, and why? I think that a reading of her testimony is that it was benign and neutral, and even if you were to read it as... Why do you think that is my question? Well, what I was about to say is even if you were to assume otherwise, it wouldn't matter, because you can't establish systematic exclusion based on her testimony plus statistics. So statistics alone are meaningless. There are plenty of cases that say that's not a basis for systematic exclusion. In terms of systematic exclusion, and as I said, Duren and Taylor v. Louisiana would have been the law at the time, you have to find an illegality. You have to find something literally on the books, a statute, a law. The one case... What if you get... It has to be a statute. It can't be that the people who do it exclude all blacks and women. But in this case, even if you were to base it purely on the testimony, they did not exclude all blacks and women. But you just said it has to be a statute, it has to be a law. In terms of systematic exclusion and the case law that supports the third prong of Duren, you have to find something more than mere testimonial evidence of an occasional pregnant woman, women who had just given birth, school teachers during the school year. That is insufficient. Even if this court were to find that perhaps, and I think there wouldn't be a huge disagreement, that that's not necessarily how you would have selected the jury, that doesn't rise to the level of what the case law determines to be the third prong of Duren. Not only is her testimony... What if the case was that nobody honored these subpoenas, which there was some of this, and the evidence is that nobody comes and, per the instructions of the jury commissioner, the sheriff goes out and brings in the men, enforces it against the men, not the women. Would that count? There is not a Supreme Court case directly on point, so I can't speak to whether or not it would count. Was there a policy? Was there an explicit or implicit instruction to do so? Would that rise to the level of the third prong? I don't know. This case, this testimony, this evidence presented doesn't. You can't establish prejudice for failing to raise this claim. Again, it's an ineffective assistance of trial counsel claim. You can't determine prejudice when you can't establish any level of systematic exclusion, per the cases that were around at the time, and certainly the ones that have followed. I don't know the answer to your specific question, but those aren't the facts of this case.  Again, trial counsel could not have been found to have been ineffective for failing to raise this claim. Moreover, we're also talking in 1989 about the prospect that time is limited, and he, as he testified, made a strategic decision not to pursue the issue of females being excluded from the resentencing jury because he had mitigation, capital sentencing. He made a tactical decision. Again, Strickland under AEDPA is doubly deferential, and the district court and this court should as well affirm the state court's reasonable determination that based on that standard, trial counsel was not ineffective. I am prepared to talk about as many more of the claims as this court would like. I'll move on at the moment and speak briefly about mitigation. Fine. The district court properly denied petitioner's claim that counsel was ineffective for failing to present additional mitigation evidence. This claim is based on the fact that during the resentencing, there were two doctors that testified who did interviews with family members, presented a personal background, drug and alcohol abuse to some extent, and then at the post-conviction hearing testified, in addition to then numerous others, much more in depth about the personal history of petitioner and his time in his childhood and his drug and alcohol abuse. The trial court's determination that counsel was not ineffective was completely reasonable because trial counsel testified that he didn't have, as post-conviction counsel did, three years to prepare. In the testimony of both experts at the post-conviction hearing, they said, oh, we agree with our original testimony. We would testify to the same. We would certainly have liked more time. We would have liked to have had a few more months to have gained a rapport with petitioner. You are not going to find a defense counsel and experts at mitigation in a capital sentencing who don't wish they had more time. That is not the basis for ineffectiveness. The state court determined that the additional mitigation evidence presented was certainly more in depth but merely cumulative and in most ways nearly identical but simply, again, more detailed, and in that way there was no ineffectiveness for failing to present it. In terms of petitioners' Brady and Giglio claims, respondents admits that the district court properly determined that the state did not commit Brady or Giglio violations. There was an evidentiary hearing on the evidence presented, the documents about the swabs. The swabs and the handwritten note that two of them were molded is not material. It's not material because there were swabs with an S taken, vaginal and rectal, and they were submitted to the Tennessee Bureau of Investigation for testing. The handwritten note that was not presented to defense counsel says that two were molded. We don't know how many there were. All of the others at the time tested negative for sperm and semen. The allegation by petitioner that these two molded swabs would then have, in isolation, tested positive and exonerated him is purely speculative, and in no way does this material, this evidence, rise to the level of being material, and the district court properly determined that no Brady violation had occurred. Moreover, in terms of the Giglio violation, the claim is procedurally defaulted and was rejected by the district court. Petitioner claims that the prosecution presented the false evidence of the medical examiner and that Dr. Harlan, who testified about his visual observations of the body, was false and known to be false, and there's just no merit to this claim. Dr. Harlan testified that his visual observations of the victim indicated that there was no sperm, and yet, as protocol would dictate, took swabs to have them tested, as he testified, quote, in an abundance of caution. His visual observations, coupled with the protocol of these swabs, petitioner can't establish that these statements were false or were known to have been false or were presented in order to present false evidence. He was merely testifying, and the transcript that's in my brief is incredibly clear, that he was testifying only to the visual observations he made, and that then, certainly, swabs were taken, and those results came back negative, minus the two molded swabs. How many swabs were there in all? We don't know. There is no number in the record. But we know that there were more than the two? Correct. Yes. The report, the final report, says that the ones that were tested, again, with an S, swabs, tested negative at the time of them being taken before trial. And so these two, I mean, again, if we're talking 10 or 100, the two, some speculation that the two would have come back with results contrary to the rest of them is purely speculative. The district court correctly determined that the prosecution did not present false evidence and this claim should be affirmed. I certainly have time remaining, but if the court has no more questions, I've addressed all of the claims. Don't have to use all your time. Thank you. Okay. Thank you. Thank you. Thank you. I have several quick points to make. The last statement about the swabs being tested and coming back negative is not true. If you look at – I'm sorry, what? Not true what? It's not true that when she said that the swabs were tested and came back negative. If you look at document 175-4, those are the notes of the vaginal swabs. They indicate that there was no – well, they indicate that there was no sperm. They were never ultimately tested for semen, as it says there, because the swabs had molded. There were only the two swabs. They were molded. There was a visual inspection of them by Dr. Harlan. You're saying that there's no evidence that there were more than two swabs? That's correct, yes. So that's my point. Well, I mean, what Ms. Bowen said was that it was negative for sperm when she was at the podium. It said it was negative for sperm, but it didn't say that it was negative for semen. Okay. I'm just saying she said sperm, not semen. In terms of the Duren claim, the quotes are all in there in our brief, pages 12 and 13, where we have Martha Atkinson saying she didn't like too many women on the jury, that they were getting too many women. People would be struck because they were women. When we talk about deficient performance, all Mr. Stack had to do was look around in the courtroom at the time of the trial. There were five women and there were 50 men. It was pretty obvious, but he didn't know the law. The Tennessee Association of Criminal Defense Lawyers manual from 1985, which was part of the post-conviction record, which he could have relied on, which he did not rely on, explained how you could make a Duren challenge. Numerous Duren challenges were being made in Tennessee by lawyers, which indicate quite clearly in light of the tactile manual that this was deficient performance, especially in capital cases, State v. Gregory Thompson, 768 Southwest 2nd, 239. I'm sorry. Let's say he had made the challenge. You said numerous challenges were being made then, but they were being denied, right? Well, they were being denied under State law, potentially, but there was also State v. Nelson, which was cited. It was a Judge Daughtry case, actually, where she actually granted the motion. So some lost, some won, but people were making the challenge. The only reason why Mr. Stack didn't make the challenge is he wasn't aware of the challenge. So that is deficient performance. In terms of Ken Jones, I would note that Maxine Where do we find the prejudice? I'm sorry. The prejudice was that Mr. Hines was not tried before a jury that comprised It's an ineffective assistance case. Where do we find the prejudice from failing to raise that in 86? Well, that issue was addressed in 2004 by the Court of Criminal Appeals. But the prejudice is that had it been raised, the jury veneer would have been quashed. He would have gotten a proper jury veneer. He would have been able to be No, had it been raised, the Court would have had to make a determination, and then it would have gone up to the Court of Appeals. I mean, don't we have to assume that the relief would have been granted? I'm not quite sure what your question is, Judge. Because it's an ineffective assistance claim, right? So part of it would be to show that if counsel had raised the claim, relief would have been granted, right? Either relief would have been granted at the trial court level or relief would have been granted at the appellate court level. So had counsel raised it, the jury veneer would have been quashed. You would have brought in a whole bunch of other people with a proper jury veneer. He would have been tried before a jury that had a fair cross-section of the community. Relief would have been granted, but what are you basing the conclusion that relief would have been granted on? That's what I'm missing. I'm sorry. Based upon the fact that he had established the violation of his rights under the fair cross-section, under Durham. Had the law been properly applied, where you have 11 years of women being underrepresented, systematically excluded, had that been brought to the attention of the court, the court should have, applying the law fairly, granted the motion, quashed the veneer, brought in a new jury. That's the word. You said should, but I think the question is would. Well, I can't say exactly what a court would do, but the law would have required the court to have done that. The court could have made the mistake and denied it erroneously and violated Mr. Hines' rights. Well, eventually it would have been on habeas the way it is now. On some level that's correct. Time is about to expire. Would you address the Ken Jones, respond to the warden's argument as to prejudice? I'm still struggling with this prejudice. In terms of prejudice, and I think Judge White, you kind of got to this in your questioning, there are two aspects of prejudice. The first aspect is, is there a reasonable probability that Mr. Hines would have been acquitted at the guilt phase of the trial? The second question is, is there a reasonable probability that Mr. Hines would have received a life sentence at the sentencing phase of the trial, where only one individual, had one individual voted for life, he would have gotten life, and where under Tennessee law, residual doubt is a mitigating factor. And so obviously he has a stronger argument as to the sentencing phase claim, but both of those claims are raised. How is it in the slightest bit relevant to the sentencing phase? That's Tennessee law, as we cited in our brief. But like his actual testimony, I mean, connect the dots there for me. I don't know that we're specifically talking about Jones' testimony. We're talking about Jones as someone who was involved in the offense. That's what I'm referring to. I'm not referring to his false testimony. I'm referring to the fact that there's evidence. The idea that he was the real killer? That he knew something more about what was going on? That would go to residual doubt? Under Tennessee law, absolutely. Under State v. Hartman and those various other cases, residual doubt. I mean, I don't know. I already said my piece on this. Do you have to suggest or ascribe a motive to Jones? I don't know that you have to ascribe a motive. It may help. I understand. Sure. And part of our argument was that the reason why the State court's decision was contrary to an unreasonable application of federal law is they said, well, you can't win, you can't show prejudice because you haven't shown a motive. But motive is not required. The question is whether or not under Tennessee law at the time, reasonable doubt could have been established as to can Jones know something more, whether he has a motive or not. But I think it's Judge White you recognized there is motive. He knows this woman. There's a $20 bill on her wrist. Was there some sort of a dispute that happened? We don't know. But that's certainly potential. And we also know from Maxie Cottrell's testimony, which we cited in our brief, and this is document 176-3, page 46, he said there had been a woman stabbed over at the motel. How did he know that? Did we know, or does the record reflect the condition of the sheets when the first responders finally came to the crime scene? I believe it does. Were they bloody? In terms of the body being wrapped, there's clear indication at the post-conviction hearing that the body was wrapped. In terms of it being wrapped, I don't recall that specifically. I guess one would expect that these sheets probably have a fair amount of blood on them if she had been stabbed four times, in which case it's probably not too far-fetched to think that somebody who comes upon it is going to think the person was stabbed. I would probably think someone had been shot. So I don't know that that says anything one way or the other. Okay. But, I mean, I guess my point is I don't really see this compelling exculpatory value of Jones telling the person at the restaurant that it looked like the victim had been stabbed. Well, I think, but that's really ultimately the question for the jury, and that's what our claim is, is that the jury should have heard this information. The jury didn't hear the information. So you and I can dispute whether it's a stabbing or it's a shooting or whatnot, but that's for the jury to determine. And if the jury ultimately believes that they're not sure that Anthony Hines committed a first-degree murder and deserves to be sentenced to death, that's their determination to make. And they never had the opportunity to do that, and that's the problem ultimately with Jones. Okay. Thank you, Mr. Bowden. Thank you, Chief Judge. Ms. Bowen, we appreciate your arguments this afternoon. The case will be submitted, and you may adjourn.